Filed 12/10/14  Chavez v. Angelica Corp. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| EMERITA V. CHAVEZ et al., | D063199 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2010-00086997-CU-OE-CTL) |
| ANGELICA CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Ronald Prager, Judge.  Affirmed.

Rastegar & Matern, Matthew J. Matern and Joshua N. Lange for Plaintiffs and Appellants.

Carothers DiSante & Freudenberger, Brent M. Giddens, Leigh A. White and Robin E. Largent for Defendant and Respondent.

Plaintiffs and appellants Emerita V. Chavez and Andrew L. McDonald (referred to individually by last name or collectively as plaintiffs) appeal the order denying their

motion for class certification of two putative subclasses of employees of defendant and respondent Angelica Corporation (Angelica). Plaintiffs assert that Angelica failed to provide meal and rest breaks in accordance with California law and required its employees to perform work off the clock, based on what plaintiffs claim was improper rounding in favor of Angelica. They also assert related derivative claims.

Angelica provides laundry services to hospitals and other clients in the health care industry. Chavez sought to represent nonexempt employees in Angelica's production facilities (production workers). McDonald sought to represent drivers who transported the laundry between the production facilities and Angelica's clients (drivers).

On appeal, plaintiffs contend the trial court erred in denying certification of the meal and rest period claims of the production workers and drivers (sometimes collectively putative class members or PCM's). Specifically, plaintiffs contend the court ignored proof of uniform policies and practices of Angelica that they allege show it consistently denied production workers meal and rest periods, including based on what plaintiffs refer to as a "walking-time" theory of recovery.

Under this theory, plaintiffs contend production workers were denied a full 30-minute meal break and two, full 10-minute rest breaks during their eight-hour shifts because Angelica required the production worker class "to walk for significant portions of their meal and rest breaks." Plaintiffs also contend the court erred in finding that the drivers' claims were preempted under federal law and that, in any event, individual issues predominated over those common to the putative class. Finally, plaintiffs contend the

2

court erred in denying their rounding claim. As we explain, we reject these contentions and affirm the order denying class certification.

OVERVIEW

A. *Employer's Legal Obligations to Provide PCM's with Meal and Rest Periods*

As discussed recently by our Supreme Court in *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*), state law "obligates employers to afford their nonexempt employees meal periods and rest periods during the workday. (See Lab. Code, §§ 226.7, 512; IWC [Industrial Welfare Commission] wage order No. 5–2001 (Cal. Code Regs., tit. 8, § 11050), hereafter Wage Order No. 5.)[1] Labor Code section 226.7, subdivision (a) prohibits an employer from requiring an employee 'to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission.' In turn, Wage Order No. 5, subdivision 12 prescribes rest periods, while subdivision 11, as well as section 512 of the Labor Code, prescribes meal periods. Employers who violate these requirements must pay premium wages. [Citations.]" (*Id.* at p. 1018, second fn. omitted.)

Pursuant to Labor Code section 512, subdivision (a), Angelica was thus obligated to provide PCM's meal breaks. This statute provides in part: "An employer may not employ an employee for a work period of more than five hours per day without providing

---

1    "The IWC issues wage orders on an industry-by-industry basis. [Citation.] Wage Order No. 5 governs restaurant employees, inter alia, while other wage orders[, such as in the instant case,] impose similar meal and rest period requirements for all other nonexempt employees in California. [Citation.]"

the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee."

Angelica also was required to provide PCM's with rest periods. Wage Order No. 5-2001 states in relevant part at subdivision 12(A): "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours." (Cal. Code Regs., tit. 8, § 11050; see *Brinker*, *supra*, 53 Cal.4th at p. 1028.) Thus, "[e]mployees are entitled to 10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on." (*Brinker*, at p. 1029.)

Against this backdrop, we next turn to the pleadings in the instant case. (See *Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022, fn. omitted [noting a court must examine the "allegations of the complaint" among other sources in determining whether the legal and factual issues presented "are such that their resolution in a single class proceeding would be both desirable and feasible"].)

B. *Pleadings*

As relevant here, plaintiffs in their operative complaint[2] brought claims against Angelica on behalf of themselves and all others similarly situated for 1) failure to provide rest periods (Lab. Code, § 226.7); 2) failure to provide meal periods (*id.*, §§ 226.7, 512 & 558); 3) failure to pay overtime compensation (*id.*, § 510 & 1194); 4) failure to provide accurate statements and maintain required records (*id.*, §§ 226, 226.3 & 1174); 5) failure to pay minimum wage (*id.*, §§ 1197, 1197.1 and IWC Wage Order No. 4-2001); 6) failure to pay upon termination (Lab. Code, §§ 201, 202, 203 & 227.3); 7) unlawful business practices (Bus. & Prof. Code, § 17200); and 8) civil penalties (Lab. Code, §§ 225.5, 226.3, 558, 1197.1 & 2699).

Plaintiffs alleged inter alia that Angelica failed to provide PCM's a 10-minute rest period for every four hours worked or a major fraction thereof and that it failed to pay PCM's one extra hour of compensation for each day in which a full rest period was missed. Plaintiffs also alleged that Angelica failed to provide PCM's who worked a shift of more than five hours a meal period or pay such employees one extra hour of compensation for each day in which a full meal period was missed.

Plaintiffs further alleged that PCM's "were often forced, through necessity of completing their assigned tasks, to take meal periods and/or portions of meal periods at the end of their shift" and that Angelica often "improperly altered the employees' time

---

2     The record includes plaintiffs' initial complaint but *not* their first amended complaint. According to Angelica, plaintiffs' first amended complaint merely added McDonald as a named plaintiff to the claims asserted by plaintiff Chavez in the original complaint.

5

records to reflect that a meal period had been taken earlier in the shift when in fact a meal period had not been taken until the very end of the employees' shift." As part of Angelica's alleged "illegal payroll policies and practices," plaintiffs asserted Angelica failed to properly maintain "accurate records as to all hours worked by an employee and records of meal periods."

Plaintiffs in their operative complaint sought damages (nominal and compensatory); restitution (all monies due plaintiffs and any profits from Angelica's alleged unlawful business practices); compensation for rest and meal periods; liquidated damages (pursuant to the Labor Code); a preliminary and permanent injunction; various civil, statutory and "waiting time" penalties; interest on unpaid wages (pursuant to the Labor and Civil Codes); attorney fees (pursuant to the Labor Code); and punitive damages.

C. *The Motion for Class Certification*

At the time plaintiffs moved for class certification, Angelica employed about 1,550 hourly, nonexempt employees in nine of its California facilities. However, plaintiffs estimated that Angelica employed between 5,000 and 6,000 nonexempt employees within the four years preceding the filing of this action (i.e., from March 5, 2006 to the present (class period)). According to plaintiffs, Angelica routinely scheduled all PCM's to work at least eight hour and 30 minute shifts, with the 30 minutes automatically deducted from each shift for a meal period.

Plaintiffs' motion for class certification (motion) sought to certify a "primary" class of "all hourly, non-exempt employees who were employed by Angelica" during the

class period. Plaintiffs alternatively sought class certification of two subclasses, one they called the "facility" class that included not only production but also "maintenance and office" workers at each of Angelica's California facilities, and the other the "driver" class where its employees primarily worked "outside of Angelica's facilities delivering laundry."

In its order denying the motion (discussed *post*), the trial court found that plaintiffs did not proffer any evidence to support certification of "maintenance and office" workers, which ruling plaintiffs do *not* challenge on appeal. Plaintiffs also do *not* challenge on appeal the ruling of the trial court denying certification of its "primary" class.

As noted, the following two subclasses are the subject of this appeal:

Subclass 1 (the "production workers" class): "All current hourly, non-exempt [production] employees of Angelica who worked inside Angelica facilities . . . at each of Angelica's California facilities, who were employed by Angelica [during the class period]."; and

Subclass 2 (the "driver" class): "All current and former hourly, non-exempt California Route Service Representative employees of Angelica ('[d]rivers'), who primarily worked outside of Angelica's facilities delivering laundry between Angelica facilities and their clients, and who were employed by Angelica in California [during the class period]."

Plaintiffs asserted in their motion that it was Angelica's "policy and practice, via a 'bell system' and direct supervisor instructions signaling the beginning and end of breaks, to deny low-wage workers a *net*, thirty minutes for meal periods and a *net*, ten minutes

for rest breaks, and require employees to continue working instead." (Italics added.) They further argued in their motion that "it was Angelica's policy and practice to automatically deduct thirty minutes for a meal period regardless of whether or not an employee actually received thirty minutes for a meal period, and never to provide a single premium payment to any employees who were denied complete, uninterrupted, net meal and rest breaks. Moreover, Angelica had a policy and practice to round up and round down employees' clock-in and clock-out times in a non-neutral manner, which deprived employees pay for actual hours worked." (Emphasis omitted.)

With respect to the "bell system," plaintiffs asserted that Angelica then used it at six of its nine facilities in California: Pittsburgh, Fresno, Los Angeles (San Fernando Road), San Diego, Colton and Orange, although Angelica also had used it at three of its other California facilities during the class period. Under this system, a bell "rings to announce to the employees the start and end times of each shift, the start and end times of each rest break, and the start and end times of each meal period." Plaintiffs further asserted that each Angelica location followed the same schedule for breaks, to wit: "first rest break after two hours, lunch two hours after first rest break, and second rest break two hours after completion of lunch."

Plaintiffs asserted that Angelica required production workers to "cease work when the start bell rings, then, upon ceasing work, the employees must necessarily walk to the lunch/break room, and then must necessarily walk back from the lunch/break room prior to recommencing work. Angelica, however, require[d] its employees to be at their stations and ready to work when the final bell r[a]ng[] signaling the end of the meal

8

period or rest break, and, in fact, does not provide any additional walking time to and from the break area.  Therefore, the employees are consistently denied the full, minimum 30-minute meal period by at least the amount of time it takes to walk to and from the break room per meal period and rest break."  (Emphasis and fns. omitted.)

Plaintiffs in their motion asserted that even where the "bell system" was not used by Angelica, the same or similar policies of Angelica lead to a denial of full meal periods because PCM's were "not allowed to begin a break until the scheduled time, upon which the break be[gan], and [were] then required to be back at their work stations by the scheduled end time for meal periods and rest breaks without any additional time provided for walking to and from the break areas."  (Fn. omitted.)

Plaintiffs assert that their expert reviewed Angelica's time-keeping records and found such records allegedly corroborated their theory that Angelica denied PCM's complete meal and rest breaks.  Specifically, plaintiffs' expert analyzed records "produced by the Ceridian timekeeping system used for payroll purposes, and also 'Spindle' records which are used in the production department as a computerized way to track the efficiency and production of linen, but also has a uniformly utilized feature whereby production workers electronically log in and out of it every time they arrive and leave their work station, including for meal and rest breaks."

Plaintiffs also asserted that drivers allegedly were denied full 30-minute meal periods because they were "required to work through some or all of their breaks in order to complete all of their job duties in a timely manner" and because Angelica did "little to instruct Drivers about meal [periods] . . . outside of what is in the Drivers Collective

9

Bargaining agreements, which say little, if anything at all," about this issue. (Emphasis and fn. omitted.) Plaintiffs asserted that Angelica expected its drivers to "manage their workload in order to create time for their breaks, and little, if anything, is done to monitor and ensure that Drivers are taking their breaks."

D. *Trial Court's Ruling Denying the Motion*

Following extensive briefing, the trial court issued its tentative ruling denying the motion. At argument, the trial court addressed the bell system used by Angelica at some of its plants in California:

"The Court: Well, at least the bell goes off. I mean, to me, looking at all the evidence, when the bell goes off, people -- if they haven't stopped working by then, they stop working. That begins their break period or their lunch period in those plants that have the bell. [¶] . . . [¶] To me, it's unusual. One thing that's kind of unusual in this case, from a broad perspective, is it seems like there are procedures that have been adopted to ensure that there actually -- as far as the production workers go, they actually get breaks at certain times, for a rest period and meal period. And that's where we -- then the plaintiffs rely, then, on this walking time. . . . [¶] . . . [¶]

"So, I mean, I think the whole case really, as far as the production workers, kind of revolves upon the issue of whether or not these arguments about walking time are suitable for class certification. And it starts with, is there any kind of illegality in not, you know -- in this walking time argument? And I haven't seen any case law that says there is.

10

"I sort of think of it in this way:  maybe this is -- you can correct me, counsel, if I'm wrong.  But court staff is entitled to a lunch break.  Sometimes they have their lunch -- some of them have their lunch right here in the courtroom.  Sometimes they walk down the hall to the jury room.  That might take 10 seconds or 15 seconds.  Sometimes they go out of the building.  The basic idea is they get their time for lunch, and their walking time is -- I mean, that's up to them, whether they want to just stay right here and not have any walking time.

"But I don't think anybody has ever said, 'well, the one hour isn't adequate if, for some reason, they have to leave the building.'  I mean, I don't think -- and I don't see any case law saying that this walking time argument, you know, is valid.  To me, I don't think it's a valid argument to start out with.  I don't think there's any case law, because it's understood.

"A lot of people don't take their breaks right in place.  They go somewhere's else to take their breaks.  But they get to stop working.  They get to -- some take their breaks right in place.  Some take their breaks five steps away.  Some take their breaks 20 steps away.  Some leave the building.  The main thing is to ensure that they have their one-hour lunch or their 15-minute break, where they are not working.  I haven't really seen anything in this case to make me think that they don't get their rest breaks and meal breaks.

"Also, besides that, it seems like there's just a whole range of practices that don't -- you can't generalize.  How far is the break room?  Do they have to go to the break room?  Can they stay in place?  You know, it seems like, from the actual evidence, there's just a

11

whole range of different practices. Different plants. Different distances from break rooms. I'm not even sure if -- I don't think there's a company-wide policy at every plant that people have to go to a break room. Sometimes when the break room is far away, they get a longer break, 15 minutes.

"I mean, to me, this is, you know -- so, one, I don't think the walking-time theory holds up even if there w[as] uniformity. And, secondly, even if there was some kind of a walking-time basis, the practices are so different in different plants and different areas of the plants, I can't possibly see how you could find commonality. There's no commonality in this."

In response, plaintiffs' counsel argued that Angelica "did not argue that [it] ceased operation during meal periods." The court, however, remained unpersuaded, noting:

"The Court: Well, I mean, there's no -- I didn't see any evidence of anybody saying, 'we get a 10-minute break, but we are still working,' you know. 'We still have to work during part of that break period,' or, 'we have to start working before the ten minutes are up.' I didn't see any evidence of any of that. That wasn't your theory.

"[Plaintiffs' counsel]: That was part of our theory, and that the Spindle records --

"The Court: Spindle records are not timekeeping records.

"[Plaintiffs' counsel]: But they are essentially timekeeping.

"The Court: They are production records.

"[Plaintiffs' counsel]: Well, the problem is they don't have a timekeeping record. So the Spindle records are a method of keeping time. And the defendants rely upon these records for their own purposes, but they want to --

12

"The Court: For timing the breaks? I don't think so.

"[Plaintiffs' counsel]: No, they don't want to deal with them for timing their breaks. They want to play games with the system. They don't want to record --

"The Court: You know, the other thing is, I see a total disconnect between what you are arguing and the overwhelming weight of the competent evidence in this case. To me, you know, the evidence you try to draw from [plaintiffs' database expert] Mr. Woolfson is suspect, weak.

"And then I just look at the -- you know, as a judge, I'm used to evaluating testimony or declarations. And I look at the overwhelming weight of the evidence, and much of your evidence is, you know -- I sustained objections to. I don't think I sustained objections to any of the defendant's evidence. But the defendant presents a whole plethora of evidence that contradicts your theory of the case in so many respects. I mean, it's overwhelming, in my mind.

"[Plaintiffs' counsel]: Well, your honor, getting back to my point, which is, the defendants did not argue or present any evidence that their operations cease during meal periods.

"The Court: You didn't present any evidence that people have to work during their 10-minute break period.

"[Plaintiffs' counsel]: We did, your honor.

"The Court: What is that evidence?

"[Plaintiffs' counsel]: The evidence is that they have a net 10-minute --

13

"The Court: That's your walking time. The net -- when you start talking 'net,' you are talking the walking time. I didn't see any evidence of anybody saying, 'we get a 10-minute break, but during that break, we are actually working, still working,' you know, 'in production.' I didn't see any evidence to that.

"[Plaintiffs' counsel]: Okay. Well, your honor, if you would look at the Spindle records, which show when they were logged in the system --

"The Court: The Spindle records, one, I don't think they are timekeeping records. Two, the conclusions you draw are based on Mr. Woolfson. I don't find him credible. Much of what he testified to, we sustained objections to. Three, I find the testimony of the people who are actually doing this work much more -- having much more probative value. I look at that testimony, and it undercuts your theories in many different ways. [¶] . . . [¶] So what I view as the evidence is totally incompatible with the theories that you are arguing to the court."

Plaintiffs argued Angelica's evidence proffered in opposition to the motion showed that nonexempt employees "had to be back on the 30th minute to start work," and, thus, such employees were not receiving their full meal periods. The court, however, found there was no "uniformity," and, thus, the variance in evidence precluded class certification:

"The Court: Wait a minute. There's no uniformity as to that. A lot of people [in the declarations submitted by Angelica in opposition to the motion] said, 'we get back late.'

"[Plaintiffs' counsel]: But --

14

"The Court: There's no uniformity to that.

"[Plaintiffs' counsel]: We took a number of their depositions.

"The Court: There's no, even, uniformity to where they are coming from or how far away they are. Some are right there, some are a few steps away, and many are in break rooms. Break rooms have all different locations in different -- depending on the production line.

"[Plaintiffs' counsel]: That's only --

"The Court: Some people get an extra five minutes to get back.

"[Plaintiffs' counsel]: Your honor, that would only go to a question of damages, because --

"The Court: Not if there's no commonality. How can you find any commonality in this?

"[Plaintiffs' counsel]: The commonality is the policy. The commonality --

"The Court: You got to start with an illegal policy. One, I don't accept that the policy [i.e., walking-time theory] is illegal in the first place. . . . [¶] In this case, the overwhelming weight of the evidence is that's not the case. There's no uniformity of evidence that these people are overworked, they don't have enough time to take their breaks. [¶] I think you started out with some good policy arguments. The problem is that the actual evidence doesn't comport with your -- it's not unusual that you could develop a preconceived idea that would be reasonable, that would comport with the case law, but the problem here is that the actual evidence doesn't comport with your preconceived idea, doesn't fit within the cases that support your point of view.

15

"I mean, I can understand how, going in, you might have thought that these were valid arguments. But based on the overwhelming weight of the evidence, again and again and again, it falls short. It's not the way you think it is. And, certainly, there's no uniformity to any of this -- [¶] . . . [¶] -- with a number of different plants, different practices. And based on the competent evidence, there is no commonality in this case."

The court next rejected plaintiffs' argument that various subclasses could be based on whether Angelica's production facilities did or did not use the bell system, noting:

"The Court: No matter what, whether they use the bell or don't use the bell, you know, your case on the production workers is predicated upon this idea that walking time is somehow a violation. I don't see -- one, I don't think there's any per se illegality. I don't see any basis for that argument.

"I think that you could make that walking time argument in virtually every case where people took breaks at different places, that were different distances. And even if there were some kind of illegality, based on the evidence, the experience of the declarants is so different, so individualized -- [¶] . . . [¶] -- I just can't possibly see any commonality. And when you add -- there's nine plants that have some different practices. I mean, people in Fresno say, 'we get extra breaks in the summer, when it's hot'; people at other plants saying, 'we get 15-minute breaks.' Other people say, 'we come back, and we come back a couple minutes late,' you know, 'that's not a problem,' from the break.

"And then the different, you know -- people say, 'well, I don't -- walking time, I stay right where I am,' or 'I'm maybe two or three steps away,' or 'maybe I'm like close by,' or maybe, you know --

16

"[Plaintiffs' counsel]:  Your honor --

"The Court:  I just don't see how you could ever -- I mean, the appellate courts say -- and I hope they mean it -- that they give great weight to what trial judges do, that have to actually manage this litigation.  I don't know how I would manage the litigation, other than having a number of individual trials."

The day after argument, the trial court confirmed its tentative ruling denying the motion.  The court in its written decision noted that under Code of Civil Procedure section 382 there must be an ascertainable class and a well-defined community of interest in order for a class to be certified.  The court ruled the ascertainability requirement was met because Angelica did not address this issue in its opposition to the motion.  However, after sustaining myriad evidentiary objections made by Angelica, including to the declaration of plaintiffs' expert Aaron Woolfson (discussed *post*), the court ruled plaintiffs had not established the community of interest requirement with respect to the production workers and drivers.

Relying in part on *Brinker*, the trial court ruled as follows in finding common issues did not predominate when compared to those requiring separate adjudication:

"In *Brinker* . . . , the California Supreme Court engaged in an extensive discussion regarding when it is appropriate for a trial court to review the merits of an action in a class certification motion.  It stated, in relevant part, that '[t]o the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them.'  [Citation.]  It also stated that 'if the presence of an element necessary to certification, such as predominance, cannot be determined without resolving

17

a particular legal issue, the trail court must resolve that issue at the certification stage. [Citation.] This is such a case.

"Here, Plaintiffs contend that 'walking time' should be added to breaks and that the failure to do so has deprived Plaintiffs and the putative class of their full meal and rest breaks. On the other hand, Defendant contends that the law does not require employers to add it.

"Plaintiffs have cited to no case law or statute that specifically requires 'walking time' be added to meal or rest breaks. Instead, they cite to wage orders to support their argument and DLSE[3] Opinion letters that are not entitled to deference. [Citation.] Even if it were required, the parties presented evidence indicating that the amount of walking time used and the circumstances surrounding meal/rest breaks in a particular case varies from employee to employee and from location to location among the 9 facilities in California. [Citation.] For example, not all the facilities use the bell system. In addition, the amount of time required to walk to the break room and whether or not a break room is involved varies among the employees and within each facility. Furthermore, there is an issue of whether employees utilized walking time at all. Finally, to the extent that an evidentiary dispute exists, the Court notes that Plaintiffs['] failure to produce certain deponents for discovery and the apparent deficiencies in their expert's qualifications cast doubt on the credibility of the evidence proffered by them. In the final

---

3    California Department of Industrial Relations, Division of Labor Standards Enforcement (hereafter DLSE).

analysis, '[g]iven the variances in the declarations . . . and deposition testimony, plaintiffs failed to demonstrate a common practice or policy.'  [Citations.]

"With respect to drivers, Plaintiffs' meal and rest breaks are preempted by the Federal Aviation Authorization Administration Act ('FAAA Act').  In *Dilts v. Penske Logistics, LLC* (S.D.Cal. 2011) 819 F.Supp.2d 1109, 1120 (hereafter '*Dilts*'), the court ruled that California's rest and meal break laws are preempted by the [FAAA Act], . . . which covers motor carriers.  A 'motor carrier' is defined as 'a person providing commercial motor vehicle transportation for compensation.'  (49 U.S.C. § 13102(14).[)] The term 'transportation' includes 'services related to that movement.'  (49 U.S.C. § 13102(23).)  The *Dilts* court determined that even though the drivers performed other services in addition to the transportation of property, such as installing appliances, it was not enough to exempt them from regulation under the FAAA Act.  (*Dilts*, *supra*, 819 F.Supp.2d at p. 1116.)  The *Dilts* court stated that California's meal and rest break laws would 'bind motor carriers to a smaller set of possible routes' and interfere with customer service by reducing 'the amount and level of service Penske can offer its customers without increasing its workforce and investment in equipment.'  (*Id.* at p. 1119.)  It also held that the motor vehicle safety exception to the FAAA Act does not apply because 'although the public health concerns addressed by the M & RB [i.e., meal and rest break] laws are certainly serious, they are not directly connected to motor vehicle safety.  If the Court were to hold them directly connected, then any law impacting the health and safety of an employee would fall within the motor vehicle safety exception simply because the employee is the driver of a potentially dangerous motor vehicle.[']  (*Id.* at p. 1123.)  A

19

similar result was reached in *Esquivel v. Vistar Corp.* (C.D.Cal. Feb. 8, 2012) 2012 U.S.Dist. LEXIS 26686.)

"Even if the drivers' rest and meal break claims were not preempted, individual issues would still predominate. Defendant was required to provide rest and meal breaks for drivers and was not required to ensure that the drivers took them. (*Brinker*, *supra*, 53 Cal.4th at p. 1017.) Drivers were informed about their entitlement to 30-minute uninterrupted meal breaks and 10-minute uninterrupted rest breaks. [Citations.]

"There is no policy or practice that prevents the drivers from taking their rest and meal breaks. Thus, individual determinations will have to be made. [Citations.] For any driver who did not take a rest or meal break, an individual determination would also be required as to whether it was the driver's own choice not to do so. (*Brinker*, *supra*, 53 Cal.4th at p. 1034.) Some drivers chose not to take their breaks for their own reasons. [Citations.]

"Finally, as to Plaintiffs['] contention that Defendant failed to record meal breaks, the United States Supreme Court in *Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 687, stated that where an employer's records are inadequate or incomplete, 'an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable evidence.' If Plaintiffs had done so then the burden would have shifted to Defendant 'to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.' (*Id.* at pp.

20

687-688.) Because Plaintiffs did not meet their burden of showing that violations of the meal and rest break laws occurred on a class[-]wide basis, Defendant was not required to come forward with contrary evidence. [¶] . . . [¶]

"The claims for overtime, minimum wage, waiting time penalties, paystub violations, and [unfair competition law] violations are predicated on the failure to adequately compensate employees for meal and rest breaks. Thus, these claims are not certifiable within the above noted defined classes since the meal/rest break claims fail for the reasons stated above."

DISCUSSION

A. *Law Governing Class Actions*

A party seeking class certification must show "the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives."[4]

---

4 Relying on a statement made by Justice Werdegar in her concurring opinion in *Brinker*, plaintiffs argue that because Angelica did not record meal periods for PCM's, a rebuttable presumption arose that no such meal periods were provided for *purposes of class certification*. (See *Brinker*, *supra*, 53 Cal.4th at p. 1053 (conc. opn. of Werdegar, J.) [suggesting that if an employer's records show no meal period for a given shift over five hours, "a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided"].) However, like other courts, we conclude this statement in a concurring opinion, which is *not* binding precedent (see *In re Marriage of Dade* (1991) 230 Cal.App.3d 621, 629), does *not* shift the burden to a defendant to refute a class-wide finding of meal break violations. (See, e.g., *Seckler v. Kindred Healthcare Operating Group, Inc.* (C.D.Cal. Mar. 5, 2013, No. SACV 10-01188 DDP (Rzx)) 2013 U.S.Dist. Lexis 29940, *8 [rejecting argument that statement by Justice Werdegar in *Brinker* relieved plaintiffs of their ultimate burden to establish requirements for class certification, including a showing there are questions of law or fact common to the class, but noting the defendant employer would have the burden to rebut the presumption of

21

(*Brinker*, *supra*, 53 Cal.4th at p. 1021; see also Code Civ. Proc., § 382.) The community of interest requirement is comprised of three factors: predominant common questions of law or fact; class representatives with claims or defenses typical of the class; and class representatives who can adequately represent the class. (*Brinker*, at p. 1021.)

The element of predominant common questions requires, essentially, that factual and legal questions common to the claims of the putative class members predominate over issues affecting members individually. (See *Brinker*, *supra*, 53 Cal.4th at p. 1021 [observing that the "'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants'"].)

Generally, "'if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) In resolving this issue, a trial court "must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate. To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them." (*Id*. at

inadequate meal periods for an *individual* employee]; *Marlo v. UPS* (C.D.Cal. 2008) 251 F.R.D. 476, 482-483 [noting that an employer has the burden to rebut the presumption of inadequate meal periods for an *individual* plaintiff when the employer's records show no meal period for a given shift over five hours, but that a plaintiff still has the ultimate burden to prove that his or her employer has a uniform policy in inadequate meal provision to satisfy the predominance requirement for class certification].)

22

p. 1025.) However, a "trial court does not abuse its discretion if it certifies (or denies certification of) a class without deciding one or more issues affecting the nature of a given element if resolution of such issues would not affect the ultimate certification decision." (*Ibid.*, fn. omitted.)

"On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' [Citation.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) Thus, we will affirm if substantial evidence supports the court's ruling, *even if* there is evidence that might also support a contrary ruling. (*Dailey v. Sears, Roebuck & Co*. (2013) 214 Cal.App.4th 974, 988 (*Dailey*) [noting a court of review does not reweigh evidence but draws all reasonable inferences supporting the order].)

B. *Meal and Rest Breaks*

1. Subclass 1—Production Workers

Initially, we note plaintiffs are unable to cite to any case or statute holding that employers must add walking time to meal and rest break times, nor have we found any such law based on our independent research. As recognized by the trial court, plaintiffs instead rely on various wage orders including IWC Wage Order No. 1-2001 (Cal. Code Regs., tit. 8, § 11010) (hereafter Wage Order No. 1). Wage Order No. 1 applies to all persons (with exceptions not relevant here) "employed in the manufacturing industry." Identical to Wage Order No. 5 at issue in *Brinker*, subsection 12(A) of Wage Order No. 1 provides: "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes *net* rest time per four (4) hours or major fraction thereof." (Italics added.) Wage Order No. 1 thus says nothing about walking time and, in any event, does not apply to meal breaks.

Plaintiffs also rely on opinion letters from the DLSE. "'The DLSE "is the state agency empowered to enforce California's labor laws, including IWC wage orders."' [Citation.] The DLSE's opinion letters, '"""while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."""'" (*Brinker*, *supra*, 53 Cal.4th at p. 1029, fn. 11.) One such letter from 1986 stated the 10-minute net rest time

24

was to exclude "any time to walk or otherwise travel to a place of rest." (Dept. Industrial Relations, DLSE Opn. Letter No. 1986.01.03 (Jan. 3, 1986).)

In another opinion letter from 1995, the DLSE was asked to comment on an employer's policy that required agricultural workers to "clock out" in the field at the start of their break but then walk anywhere from one to two-and-a-half minutes to a rest area for water and to use the bathroom. (Dept. Industrial Relations, DLSE Opn. Letter No. 1995.06.02 (June 2, 1995).) The DLSE noted that this was the *first* time it had been asked to comment on such a policy (despite what it said in Letter No. 1986.01.03); that it recognizes a de minimis rule that is "fact driven," in which time need not be counted toward the employer's obligation to pay; and that requiring a worker to "walk 30 seconds or so each way to toilet facilities or a suitable rest area during the break period would seem to be de minimis," but a walk that required a worker to spend half of the 10-minute break period to use such facilities would not. (*Id.* at p. 3.) As such, the DLSE concluded in its 1995 opinion letter that the use of the word "net" in the wage orders "is obviously meant to restrict the employer from practices which would limit the 'rest' period and, at the same time, is designed to insure that the employee receives the rest which the Commission has deemed necessary." (*Ibid.*)

In yet another opinion letter from 2002, the DLSE interpreted the word "net" in subsection 12(A) of the IWC Wage Orders to mean the 10-minute rest period must be consecutive, in contrast to a succession of rest periods that add up to 10 minutes. (Dept. Industrial Relations, DLSE Opn. Letter No. 2002.02.22 (Feb. 22, 2002) p. 1.) The DLSE in this same opinion letter addressed the situation when an employer "rotates the

25

employees from work positions to relieve the employees from boredom and work burdens." (*Id.* at p. 2.) Because "there must be a net 10 minutes of rest provided in each 'work period' and *the* rest period must be, as the language implies, duty-free," the DLSE concluded an employer would be precluded "from using time during which the employee is required to change from one work station to another as a rest period unless the time allotted is, in fact, a net 10 minutes and is, as far as is practicable, in the middle of the work period." (*Id.* at p. 1.)

Here, assuming arguendo the law recognizes plaintiffs' walking-time theory under the facts of this case, we conclude there is ample evidence in the record supporting the finding of the trial court that during the class period there was no uniform policy or practice consistently applied by Angelica that deprived production workers from receiving a net 30-minute meal and two, 10-minute rest breaks, including as a result of walking to and from Angelica's break rooms (i.e., plaintiffs' walking-time theory). (See *Brinker*, *supra*, 53 Cal.4th at p. 1033.) In the absence of a uniform policy or practice, there is no common answer as to why production workers may not have taken a full 30-minute meal break and two, full 10-minute rest breaks, and individualized inquiries into each would be required.

Indeed, the record shows that production workers were *not* required to use the break rooms for meals and rest periods but were instead "free to spend their break time wherever they chose -- in the break room, going outside, going to their car, walking around the plant to talk to co-workers, or staying in their particular area"; that for some production workers it took only "10 to 15 steps" for them to walk from their work station

26

to the break room; that many production workers were alerted of the start and stop of meal and rest breaks by a bell, which ensured they received the net meal and rest breaks required by law; that where a bell system was not used, production workers were alerted of the start and stop of meal and rest breaks either by a supervisor or by looking at the clock themselves; that some production workers took longer than 30-minute meal and 10-minute rest breaks; that meal and rest breaks were never less than 30 minutes and 10 minutes, respectively; that for some production workers, meal breaks were taken together, which led to a complete shutdown of the Angelica facility during the break period; that some production workers ensured their meal breaks were at least 30 minutes long and their rest breaks at least 10-minutes long because they keep track of the timing of such breaks themselves; that production workers working an eight-hour shift took their first 10-minute rest break at the two-hour mark of their shift and the second rest break two-hours after their 30-minute meal break; and that no manager or supervisor of Angelica instructed or suggested to the production workers that meal and rest breaks should be shortened or skipped.

What's more, even where a bell system was used in an Angelica production facility, the record shows there was no uniformity regarding how it was used. For example, at one facility a bell rang to signal the start of meal and rest breaks, another bell rang two minutes before the end of the break to warn production workers that the break was almost over, and then a final bell rang when the break ended to alert the employees they should be back at their workstations.

27

At another Angelica facility, there was a two-minute warning bell and then a final bell, but, in that particular facility, employees were simply expected to be "on their way back to their work station" when the final bell sounded. In yet another facility, there was no warning bell before the end of the break. Instead, employees started walking back to their work stations when the final bell rang. In that particular facility, the bell generally was rung two or three minutes *after* the 30-minute meal period and the 10-minute rest periods to give employees the opportunity to get back to their work stations.

In reviewing this evidence, we note Angelica proffered the declarations of 170 PCM's and the deposition testimony of many other PCM's, which support the finding of the trial court that Angelica did not have a uniform policy or practice—including as a result of the aforementioned walking-time theory advanced by plaintiffs—that consistently deprived production workers of their full meal and rest breaks as required by law. (See *Brinker*, *supra*, 53 Cal.4th at p. 1033; cf. *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 225 & 233 [noting class certification of three subclasses was proper because, unlike the instant case, the defendant security guard company there had a uniform policy, as reflected both in an agreement it made its employees sign and in the deposition testimony of a company vice-president, requiring employees to take on-duty meal periods and not to leave their posts for any off-duty rest breaks because the company believed the nature of the work prevented an employee "from being relieved of all duties"].)

Conversely, the record shows plaintiffs' evidence of the existence of such a uniform policy or practice was deemed less than satisfactory by the trial court, as the

28

record shows the court sustained objections to all but four of the 21 declarations proffered by plaintiffs in support of their motion[5] and found plaintiffs' database expert, Woolfson, lacking credibility after also sustaining multiple objections to significant portions of his declaration.

Moreover, certain evidence proffered by plaintiffs actually supports the trial court's ruling that there was no uniform policy or practice consistently applied by Angelica that deprived production workers from receiving a net 30-minute meal and two, net 10-minute rest breaks, including under plaintiffs' walking-time theory. For example, a production worker from Angelica's facility in Turlock, California testified in her declaration in support of plaintiffs' motion that production workers received 15-minute rest breaks; that depending on where the workers were located when the bell rang, it took "about two or three minutes to walk" from a work station to the break area; and that workers had to be back at their work station when the final bell rang.

A production worker from Angelica's Fresno, California facility testified that the bell "usually, if not *always* . . . [rang] one or two minutes past the beginning of our scheduled meal break time and one or two minutes before 30 minutes has been completed." (Italics added.) This same production worker testified in support of the motion that Angelica engaged in the same practice with respect to the 10-minute rest breaks.

---

5    We discuss plaintiffs' challenges to certain of the trial court's evidentiary rulings *post*, following somewhat the sequence of issues raised by them in their opening brief.

However, this testimony was contradicted by the testimony of another production worker from the same facility who stated a bell rang when it was time to start meal and rest breaks and rang when those breaks ended, but did *not* state the bell *always*, or even once, rang late to start such breaks and/or rang early to end them. This contradiction in the testimony also supports the finding of the trial court that Angelica did not have a uniform policy or practice that deprived production workers from receiving their full meal and rest breaks.

Plaintiffs also rely on "Spindle records" in support of their contention the court erred when it found Angelica lacked a uniform policy or practice in conflict with governing wage and hour protections. Plaintiffs claim such records are a "highly accurate method of tracking when [p]roduction [w]orkers arrive and leave their work stations." As noted, the trial court disagreed, finding such records tracked production and not time keeping, which finding we note is supported by substantial evidence in the record. There also is substantial evidence in the record supporting the finding that production workers were not required to "spindle" in and out their exact break times and that such workers had the choice as to when to "spindle" in and out.

Moreover, Angelica's expert, Joseph Krock, Ph.D., testified that his review of the Spindle records (relied on by plaintiffs' database expert, Woolfson) "confirm[ed] that this system [was] not used consistently by all employees"; that some employees recorded "'lunch' breaks often, while others rarely record[ed]" them; that treatment of "'[b]reak' transactions" in such records also "vari[ed] from person to person"; and that Spindle data are "of limited use for the analysis of meal and rest breaks" because "at best, these data

30

give an incomplete and imprecise picture of the employees' behavior and should not be used to measure meal and rest break issues."

Krock further testified that regardless of the inapplicability of such records to assess meal and rest break issues, "the numerous errors in the analysis discussed in the Woolfson Declaration nullify his conclusions" based in part on such records.[6] Krock noted that Woolfson made "significant errors" in processing and analyzing the Spindle data, including: "fail[ing] to include 16 pages of data that were provided to him," which showed Woolfson "did not exercise care in the simplest steps of his assignment, an indicator that his analyses cannot be given weight"; using flawed procedures to convert the raw Spindle data into the file used by Woolfson for his analyses and conclusions; and "calculat[ing] break times using incorrect measures of time," which Krock opined was the "error most fatal to Mr. Woolfson's Spindle analysis."

With regard to his latter conclusion, Krock noted Woolfson in his Spindle analysis retained only certain categories of information that Krock opined had "no indicator of what type of work or break the data represent." Because there were "many activities in which an employee may be involved including attending meetings," according to Krock a "large portion of these 'Status' times [used by Woolfson] [were] compensable time for which the employee [was] being compensated."

Krock also opined that Woolfson "manufactured" his definitions of meal and rest breaks using the spindle data by defining a rest break as "a length of time between 1 and

---

6    As noted, the trial court sustained myriad objections to Woolfson's declaration, including many that discussed his use of, and findings based on, the Spindle records.

20 minutes," and a lunch break "with lengths between 21 and 60 minutes." Using these "variables," Woolfson then tabulated the "number of short, late, or missing meal and rest breaks." According to Krock, such "definitions are fabricated by Mr. Woolfson and contradict the data," as they show, among other things, that "employees took 5,975 rest breaks over a period of 1,572 shifts." However, if accepted, those figures show that "*on average* the employees took 3.8 rest breaks *per day.* Given that most of these shifts are around eight hours, this average far exceeds the legal requirement of two per day" and, thus, according to Krock, show Woolfson's "break definition is flawed."

Krock also compared Spindle data used by Woolfson and Woolfson's analysis based on such data to show how these various errors affected the reliability of Woolfson's analysis. In one instance, the data showed an employee beginning his or her day at 1:07 a.m. by working on the "'Ironer -- Large Piece 5 Lane 2'" until 2:03 a.m. "At that time, the employee logs into 'Other Area' for two minutes . . . . At 2:05 a.m. the employee again works on 'Ironer -- Large Piece 5 Lane 2' until 2:42 a.m. at which time the employee logs into 'Other Area' for four minutes . . . . At 3:01 a.m. the employee logs in for a 15 minute break . . . .

". . . As shown below, Mr. Woolfson's analysis counts the two 'Other Area' transactions as breaks . . . . The employee would be credited for two 'short breaks' of 2 and 4 minutes [citation], respectively, in spite of the fact that neither of these items is a break. Additionally, [Woolfson's] analysis ignores the real 15-minute break because his analysis only counts the first two breaks."

Krock provided another example of how Woolfson's "manufactured definitions" failed to reliably calculate breaks. In that example, "employee 34846 on May 12, 2010 actually worked for eight hours from 13:01 to 21:31 and took two rest breaks equal to ten minutes each starting at 15:01 and 19:31 and one lunch break of 30 minutes starting at 17:01. However, according to Mr. Woolfson's own data, . . . he determines that the employee took two short breaks [citation] and one short lunch [citation]. None of these 'breaks' are actual breaks; the original data clearly indicate the meal and rest breaks were valid."

Krock also pointed out that Woolfson included in his summary of allegedly missed or shortened meal and rest breaks (based on Woolfson's flawed definition) meal breaks of 30 minutes and rest breaks of 10 minutes. Because such breaks are valid under the law, Krock opined they should not have been included in Woolfson's counts and this was yet another reason to conclude Woolfson's analysis and conclusions were unreliable.

As noted, the trial court found Woolfson lacking in credibility. (See *Dailey*, *supra*, 214 Cal.App.4th at p. 991 [recognizing that in considering the substantiality of evidence, we defer to the trial court's credibility determinations and recognizing that "if the parties' evidence is conflicting on the issue of whether common or individual questions predominate (as it often is and as it [is] here), the trial court is permitted to credit one party's evidence over the other's in determining whether the requirements for class certification have been met"].) In light of this record, we conclude plaintiffs have failed to show the trial court abused its discretion in discounting the testimony of Woolfson when it found plaintiffs failed to show a uniform policy or practice that

33

deprived production workers of their full meal and rest breaks. (See *Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 701 [noting that "'[i]t is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his [or her] opinion in evidence [citation], and its ruling will not be disturbed upon appeal unless a manifest abuse of that discretion is shown'"].)

In any event, even assuming plaintiffs proffered sufficient evidence that, if credited, would have supported a finding contrary to the one made by the trial court, including evidence that the time for production workers to walk to and from a break room/rest area was not de minimis (see *Lindow v. U.S.* (9th Cir. 1984) 738 F.2d 1057, 1062 [noting for purposes of the Fair Labor Standards Act that "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded"], cited with approval in Dept. Industrial Relations, DLSE Opn. Letter No. 1995.06.02 (June 2, 1995) p. 2), we nonetheless must affirm the finding made by the trial court of the lack of a uniform policy or practice (or a common method of proof of such) to deny production workers their full meal and rest breaks because, as noted, that finding is supported by ample evidence in the record. (See *Brinker*, *supra*, 53 Cal.4th at p. 1051; see also *Dailey*, *supra*, 214 Cal.App.4th at p. 992 [noting the inquiry on appeal is *not* whether plaintiffs' evidence may have been sufficient to support class certification but rather whether the record contains substantial evidence supporting the trial court's conclusion that individual questions are more numerous and significant than common ones].)

34

2. <u>Subclass 2—Drivers</u>

Plaintiffs contend Angelica's lack of a formal meal and rest period policy for drivers and their evidence that some drivers frequently do not take their meal and rest periods show the trial court erred when it found individual questions predominate and denied certification of this putative subclass. We disagree.

First, whether Angelica had a formal meal and rest period policy with respect to drivers is not "evidence of a policy or widespread practice of [the defendant employer] to deprive nonexempt employees of uninterrupted meal periods and rest breaks." (See *Dailey*, *supra*, 214 Cal.App.4th at p. 1001 [rejecting argument of plaintiff that defendant's lack of a formal written policy regarding meals and rest breaks, its failure to provide training on those subject matters and its failure to keep track whether its employees took their meal and rest breaks showed a "policy or widespread practice" of denying employees uninterrupted meal and rest breaks, and instead concluding such evidence did not show the employer prohibited putative class members from taking such breaks or had a uniform policy or practice of requiring on-duty meal and rest breaks]; cf. *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341, 1363-1364 [noting defendant company's policy of requiring employees to purchase and wear company clothing and merchandise as a condition of employment did "not provide a common method of proving liability because [it was] not substantial evidence of the allegations in the [operative complaint] which describe the allegedly illegal employment practices" for which plaintiffs sought class certification].)

Second, we conclude the trial court's findings that Angelica did inform drivers of their entitlement to uninterrupted meal and rest breaks *and* that Angelica did not have a uniform policy or practice of denying drivers such breaks (i.e., based on route demands) are supported by substantial evidence in the record. (See *Dailey*, *supra*, 214 Cal.App.4th at p. 992.) Such evidence was derived from more than two dozen PCM declarations and several manager and PCM depositions evidencing that drivers were informed of their entitlement to, and were instructed to take, meal and rest breaks in compliance with California law.

That plaintiffs proffered some evidence, if credited, that shows drivers sometimes did not take their breaks or combined their breaks does not establish Angelica had a uniform policy or practice of preventing drivers from taking their legally-required meal and rest breaks; to the contrary, such evidence actually supports the trial court's finding that individual questions predominate over those common to the putative subclass.[7] In any event, "[p]roof an employer had knowledge of employees working through meal

_____

[7] By way of example, John Aguilar testified on behalf of plaintiffs that "[m]ost of the time" he took two, separate 10-minute rest breaks while driving but that "[m]aybe once a week" he combined his 10-minute rest breaks with his meal break. Steven Ortiz testified that when driving he took his three 10-minute rest breaks together, for a 30-minute break, in the course of a 12-hour shift. James Valadez testified he "usually" took his meal breaks within the first five hours of work, but he also testified it "depend[ed]" on his route and the number of stops he made. Gerald Villaverde testified that he was never told by a manager of Angelica that he could not take a break until working at least six hours; that he was told he should take his lunch break after five hours; that he took a 10-minute break after two hours of driving; and that "sometimes" he combined his breaks, depending on "what goes on during the day. You know, you might get tied up at a stop and have to do inventory or -- so it takes time. So you don't really get your breaks at the time you want to, but, you know, if we have to take -- we will take either a half-hour break or a 50-minute break to an hour."

36

periods will not alone subject the employer to liability for premium pay; employees cannot manipulate the flexibility granted them by employers to use their breaks as they see fit to generate such liability." (*Brinker*, *supra*, 53 Cal.4th at p. 1040.)[8]

C.  *Rounding*

Plaintiffs contend the trial court erred when it refused to find that Angelica's "rounding policy," although facially neutral, over time allegedly benefited it and resulted in a failure to compensate PCM's for all time they worked.

Federal regulation permits the practice of "recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour," as long as the "arrangement averages out so that the employees are fully compensated for all the time they actually work" and the practice is not used to avoid compensating the employees properly "for all the time they have actually worked." (29 C.F.R. § 785.48(b).)  Courts have interpreted this regulation to permit "employers to use a rounding policy for recording and compensating employee time as long as the employer's rounding policy does not 'consistently result[] in a failure to pay employees for time worked.'" (*Alonzo v. Maximus, Inc*. (C.D.Cal. 2011) 832 F.Supp.2d 1122, 1126 (*Alonzo*).)  "[A]n employer's rounding practices comply with [the regulation] if the employer applies a consistent rounding policy that, on average, favors neither overpayment nor underpayment." (*Ibid*.)

---

[8]     In light of our conclusion on this issue, we deem it unnecessary to decide whether the driver meal and rest claims are preempted by the FAAA Act (49 U.S.C. § 14501), which the trial court found was an alternate basis to deny certification of this putative subclass.

Following *Alonzo* among other federal authorities, this court relied on the federal regulation and its adoption by the DLSE and concluded in *See's Candy Shops, Inc. v. Superior Court* (2012) 210 Cal.App.4th 889, 907 (*See's Candy*) that "an employer is entitled to use [a typical] rounding policy if the rounding policy is fair and neutral on its face and 'it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.'"

As noted, it is undisputed here that Angelica employed a facially neutral time rounding policy, which provided as follows:

"It is each person's responsibility to record your arrival and departures on the clock at the right time.  You have to punch in no more than 7 minutes before your starting time or no more than 7 minutes after your quitting time.  Any person who does not follow this rule could be given a disciplinary warning."

Plaintiffs contend that because Angelica's time-keeping system, Ceridian, automatically rounded PCM's time punches to the nearest quarter interval, or 15 minute mark, if an employee clocked in up to seven minutes before the start time, the employee allegedly "would receive no compensation for time that was lost due to automatic rounding."  However, this evidence does not show time "actually worked" by PCM's in contrast to time PCM's may have been present on Angelica's premises but not engaged in work activities.  (See *Alonzo*, *supra*, 832 F.Supp.2d at p. 1128; 29 C.F.R. § 785.48(b) [noting that rounding will be accepted provided that it does not result "in failure to compensate the employees properly for all the time they have *actually worked*" (italics added)]; *See's Candy*, *supra*, 210 Cal.App.4th at p. 907 [same].)

38

Nor does such "on-premises" evidence show PCM's were subject to Angelica's control, which also would require Angelica to compensate its employees. (See *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 587 [concluding that employees were "subject to the control of [their] employer" during the time they traveled to the employer's work site because the employer "required plaintiffs to meet at the departure points at a certain time to ride its buses to work, and it prohibited them from using their own cars, subjecting them to verbal warnings and lost wages if they did so," and, therefore, the employees' compulsory travel time constituted compensable hours worked under the applicable wage order].)

The evidence in the record, credited by the trial court, shows that Angelica did not allow its employees to start work until their shift began (via the bell system or as otherwise instructed), even if they clocked in during the seven-minute grace period. (See *See's Candy*, *supra*, 210 Cal.App.4th at p. 892 [noting employees could "punch in" up to 10 minutes before and after their scheduled work times and noting that defendant employer's policy did not allow employees to work during this grace period].)

What's more, the record shows that Angelica neither told PCM's to arrive for work before their shifts started nor allowed them to continue working when their shifts ended. And, if a PCM worked after his or her shift ended, the record shows Angelica paid that PCM for the overtime worked. In light of such evidence, and in light of the lack of evidence in the record that Angelica's rounding system consistently resulted in underpayment to the average employee over time, as required by the federal regulation

39

and our *See's Candy* decision, we conclude the Ceridian time-keeping records are largely immaterial.

We further conclude this evidence also supports the finding of the trial court that individual factual determinations would have to be made, based on the lack of common proof, regarding whether any particular employee who clocked in or out during the grace period "actually worked" and/or was subject to Angelica's control during that grace period, entitling him or her to compensation. (See *Dailey*, *supra*, 214 Cal.App.4th at p. 991 [noting the inquiry on appeal is not whether plaintiffs' evidence *may* have been sufficient to support class certification but rather whether the record contains substantial evidence supporting the trial court's finding that that individual facts or questions are more numerous and significant than common ones].)[9]

D. *Evidentiary Rulings*

Plaintiffs contend the trial court abused its discretion when it sustained myriad objections to the PCM declarations and to the Woolfson declaration proffered by plaintiffs in support of their motion.

We apply the abuse of discretion standard of review to the trial court's ruling on the admissibility of evidence. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900.) "''The burden is on the party complaining to establish an abuse of discretion, and

---

[9]    In light of our conclusion the trial court properly exercised its discretion when it denied certification of plaintiffs' claims for meal and rest break violations and for rounding, we further conclude the trial court also properly denied class certification of plaintiffs' remaining claims (i.e., overtime, minimum wage, waiting time penalties, paystub violations and unfair competition law violations), which the parties admit were derivative of, and predicated on, the meal and rest break/rounding claims.

unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power."'" (*Dorman v. DWLC Corp.* (1995) 35 Cal.App.4th 1808, 1815.)

Regarding the PCM's, plaintiffs do not contest on appeal the trial court's refusal to consider the declarations of PCM's when the witness was illiterate and when an uncertified translator interpreted the declaration for him or her. Plaintiffs also do not contest the court's refusal to consider the declarations of PCM's that did not appear for deposition, as required by court order.

Of the remaining declarations of PCM's submitted by plaintiffs, we note the court sustained myriad objections on the grounds that the English versions of such declarations did not say they were signed under penalty of perjury and that the declarant's testimony was inconsistent with his or her deposition testimony.

While plaintiffs claim the Spanish version of such declarations stated they were signed under penalty of perjury, plaintiffs ostensibly did not bring that fact to the attention of the trial court. In any event, plaintiffs in their briefing only address four specific instances in which they contend the court erred in sustaining objections to the remaining PCM declarations. (See *Haight v. Handweiler* (1988) 199 Cal.App.3d 85, 88, fn. 1 [noting the failure to specify the evidence forfeits the evidentiary claim of error].)

Even if we assume the trial court erred in sustaining such objections, as plaintiffs assert, we nonetheless conclude that error was harmless. (See Cal. Const., art. VI, § 13 [stating no judgment will be set aside based on among other grounds the "improper admission or rejection of evidence, . . . unless, after an examination of the entire cause,

41

including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].) "'A miscarriage of justice . . . occurs . . . when it appears reasonably probable that were it not for the error a result more favorable to the appellant could have been obtained.' [Citation.] 'Prejudice is not presumed and the burden is on the appellant to show its existence.' [Citation.]" (*Candelaria v. Avitia* (1990) 219 Cal.App.3d 1436, 1444.)

That is, even if such evidence is credited, the record nonetheless contains ample evidence to support the finding of the trial court that Angelica did not have a uniform policy or practice that deprived PCM's from receiving their full meal and rest breaks and that individual factual determinations would have to be made, based on the lack of common proof, regarding whether any particular employee who clocked in or out during the grace period "actually worked" and/or was subject to Angelica's control during that grace period for purposes of plaintiffs' rounding claim. (See *Dailey*, *supra*, 214 Cal.App.4th at p. 991.) As such, we conclude plaintiffs have failed to show it was reasonably probable that, but for the (alleged) error in sustaining Angelica's evidentiary objections to the PCM declarations, a result more favorable to plaintiffs would have been obtained. (See *Candelaria v. Avitia*, *supra*, 219 Cal.App.3d at p. 1444.)

Regarding the objections sustained by the trial court to the Woolfson declaration, as noted the trial court found him lacking credibility. Plaintiffs take issue with this finding, contending it was based on what plaintiffs considered were allegedly "very minor discrepancies" in the time records Angelica produced that Woolfson used to summarize the data. Plaintiffs specifically contend that the omission of such data by

42

Woolfson allegedly involved only about 7 percent of the files produced by Angelica, which plaintiffs further contend was a "random, insignificant number" of omitted files that had no material bearing on the outcome of Woolfson's analysis.

However, as noted *ante*, Angelica's expert, Krock, found Woolfson's omission of such records significant and, in Krock's view, that omission showed a lack of due care in what Krock opined was the "simplest steps of [Woolfson's] assignment." In addition, Krock opined there were myriad errors in Woolfson's analysis beyond merely omitting records from that analysis. Such errors included (i) using flawed procedures to convert the raw Spindle data into the file used by Woolfson for his analyses and conclusions; (ii) improperly calculating break times using incorrect measures of times; and (iii) manufacturing definitions of meal and rest breaks that contradicted the data and led to unreliable results.

It is axiomatic that it is within the purview of the trial court to make its own findings on credibility, including experts, and that this court generally defers to the factual determinations made by the trial court if supported by substantial evidence. (See *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1, 49.) The substantial evidence proffered by Angelica, including the testimony of Krock, the 170 declarations and the deposition testimony of various witnesses, supports the trial court's determination that

Woolfson and his findings (which as noted, were based in large measure on the Spindle records) were lacking credibility.[10]

What's more, even if we assume the court erred when it sustained the various objections to Woolfson's declaration and when it determined Woolfson and his findings lacked credibility and reliability, we nonetheless would conclude those errors were harmless because, as noted, the record contains ample evidence credited by the trial court both disputing the uniform application of Angelica's business policies and practices in connection with meal and rest breaks of PCM's and showing there was no common proof that PCM's were required to work before or after their shifts. (See *Dailey*, *supra*, 214 Cal.App.4th at p. 997 [noting that whether a trial court could have properly certified a class based on conflicting evidence is not the inquiry before a reviewing court but rather it is whether substantial evidence supports the finding of the trial court that the plaintiff's theory of liability was susceptible of common proof at trial].)

---

[10] In reaching our conclusion, we do not rely on the fact that another court rejected Woolfson's expert opinion in a class action against table grape growers involving among other issues rest and meal periods. (See *Rojas v. Marko Zaninovich, Inc.* (E.D.Cal. Sept. 19, 2011, No. 1:09-cv-00705 AWI JLT ) 2011 U.S.Dist. Lexis 106044.) In that case, the court found Woolfson's opinions unreliable for a variety of reasons including because his original report contained myriad errors; he minimized the degree to which his original report was wrong; he failed to explain adequately why he took certain actions; and other experts compared his results to the data produced and determined his results were wrong because he omitted certain data. (*Id.* at pp. *8-*9.)

DISPOSITION

The trial court's order denying class certification is affirmed.  Costs on appeal are awarded to Angelica.


_____

BENKE, Acting P. J.

WE CONCUR:


_____

HUFFMAN, J.


_____

NARES, J.